STATE v. MACKEN et al.

(Court of Civil Appeals of Texas. Austin. Dec. 24, 1913. Rehearing Denied Jan. 21, 1914.)

1. TRIAL (§ 365*)—VERDICT—FINDINGS—CONSTRUCTION.

In a suit by the state over land which it claimed as part of the bed of a navigable stream, *held* that findings of fact by the trial court, in view of the findings embodied in the judgment, constituted a finding that the locus in quo was not a part of the bed of the stream at the time a patent to it was granted by the state.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 871–874; Dec. Dig. § 365.*]

2. NAVIGABLE WATERS (§ 37*)—PATENTS—INTERESTS CONVEYED.

A patent to public lands abutting on a navigable stream, the channel of which is reserved to the state, does not give the riparian owner any rights to the bed.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 201–226, 285; Dec. Dig. § 37.*]

3. NAVIGABLE WATERS (§ 36*)—ACTIONS—PATENTS—CONSTRUCTION.

In a suit over land which the state claimed on the ground that its title had never been devested because it was an island in the bed of a navigable stream, evidence *held* sufficient to sustain a finding that the locus in quo at the time it was patented merely abutted on the stream.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 180–200; Dec. Dig. § 36.*]

Appeal from District Court, Travis County; Geo. Calhoun, Judge.

Suit by the State of Texas against J. J. Macken and others. From a judgment for defendants, plaintiff appeals. Affirmed.

B. F. Looney, Atty. Gen., and G. B. Smedley, Asst. Atty. Gen., for the State. W. F. Ramsey and E. C. Gaines, both of Austin, for appellees.

KEY, C. J. We copy the following statement of the nature and result of this suit from appellant's brief:

"The land in controversy in this case is an island about 400 yards long and 250 yards wide, and a sand bar about 300 yards long and 150 yards wide, both situated in the bed of the Colorado river, a navigable stream, and within the limits of the city of Austin. Appellant, the state of Texas, and its lessee, contend that the island and the sand bar belong to the state of Texas, for the reason that they are and have been islands situated in the bed of a navigable stream, while the appellees contend that the island and sand bar are and were included within the bounds of a tract of land known as the Decker grant, lying along the south bank of the Colorado river; said grant being within the bounds of Milam's colony and having been made March 17, 1835, to Isaac Decker by the commissioner of the state of Coahuila and Texas for Milam's colony. Milam's colony calls to run up the Colorado river with its right bank.

The Decker grant, which is a part of the land within the bounds of said colony, calls to be situated on the west side of the Colorado river and to run up the river with its meanders. Appellant contends that the stream of water flowing south of the land in controversy is a part of the Colorado river, and that therefore the bounds of the Decker grant are confined to the south bank of the said stream on the south of the land in controversy. Appellees contend that, at the time the Decker grant was made, the stream flowing along the south of the land in controversy was not a part of the Colorado river, but a mere channel or slough, and that therefore, when the Decker grant called to follow the bank of the Colorado river, it followed the bank of what appellees claim to have been at that time the main channel of the river, and therefore included within its bounds the land in controversy.

"The suit originated by the filing by plaintiffs, the state of Texas and its lessee, Blanks, of a petition in which it was alleged that the property sued for was an island and a sand bar located in the bed of the Colorado river, a public navigable stream; that the defendants, without lawful authority, had entered upon said property, and had built a fence around a part of it, and were about to remove from the property valuable deposits of sand and gravel, and prayed that the defendants be enjoined from trespassing upon said island and sand bar, and from inclosing the same and from taking sand or gravel therefrom.

"The defendants Walton, Allen, and Gracy in their answer admitted the entry on said island but claimed to own the property as a part of the Decker grant, and prayed that the temporary injunction which had been issued against them be dissolved, and in a crossbill against plaintiffs prayed for judgment against plaintiffs for the title and possession of the premises and for damages. The other defendants adopted the answer of the defendants Walton et al. On the trial of the case the defendants abandoned their cross-action. The case was tried before the court without a jury, and the court made the following findings of fact:

"'That on March 17, 1835, Coahuila and Texas granted to Isaac Decker a league of land lying on the south and west of the Colorado river, and fronting on the same, known as the Decker league. That said grant fronts on the Colorado river from a distance of several hundred varas below and above the land in controversy, and the call in the original field notes of the Decker for the line fronting on the river is as follows: "Beginning at the northeast coroner of league No. 20 and the northwest corner of a concession of 10 leagues. Thence up the river with the meanders of same to the mouth of Spring Creek." The land in controversy being a little below

the center of the line meandering the river front opposite the city of Austin and just below where Congress avenue crosses the river.

" 'That the various official maps of the city of Austin that are archives of the General Land Office of 1839 and 1840 indicate a slough, drain, or channel of some character, leaving the main channel of the river just below where Congress avenue crosses the river, and, running to the south and west of a small body of land, again connects with the river about 500 or 600 yards below. That this slough or channel as shown by the maps is relatively very much smaller than the river, and the territory included within it and the river on the north and east occupies, on the maps, approximately the position of the land in controversy.

" 'That the earliest period to which the testimony of any living witness relates was in 1839, and that at that time there was a slough or channel leaving the river just below Congress avenue, running to the west and south of the land in controversy, and again connecting with the river about the mouth of Bouldin creek. That the bottom of this slough was above the level of the main or north river channel during those periods of the year when the river was in its lower stages, and that water ran through on that side at that time only during those periods of the year when the river was at its maximum place, and that, for a considerable part of the time at least, this slough then presented the appearance of a wet weather slough or wasteway for the river.

" 'That from the drawings on the official maps the land in controversy was covered with timber in 1839, and from the earliest recollection of living witnesses to about 1867 or 1869, both the land in controversy and the river valley or bottom to the south, which are now bare of timber, was covered with large timber, pecans, elms, hackberries, some of them two or three feet in diameter and more than a hundred years old, and that during this period, and before the Civil War, the land in controversy was covered with good soil, and that for a time a garden or truck patch was cultivated upon it.

" 'That from about 1850 to 1867 or 1869, water from the Colorado river flowed at intervals through the channel to the southwest of the land in controversy. That the same would during this period, at some portions of the year, carry water its entire course, having its greatest depth about the center of the south of the land in controversy, and at other times it would be entirely dry in places and at other places standing in pools.

" 'That about the years 1867 and 1869 the Colorado river had two severe floods, the most severe in the memory of living witnesses, and that these floods swept away all the large timber from the land in controversy, and from the entire valley or bottom to the south of it, and left it bare as it is now, and that these floods caused changes in the channel of the river, broadening and deepening the channel on the south to about what it has remained since, and to something near its present condition.

" 'That from the year 1896 measurements of the river flow at this point have been accurately taken, and that during the summer months there have been periods ranging from 30 to 79 days when the water did not flow in the south channel, and that the water is not now flowing through the south channel when the river is in its low stages. That at all times the north channel has been the main channel of the Colorado river.'

The court made the following conclusions of law:

" '1. From these facts I conclude as a matter of law that at the time the Decker grant was made in 1835 the land in controversy was a physical part of the Decker league, which covered the territory to the south and west, above and below.

" '2. That at the time of the Decker grant in 1835 the land in controversy was not in a legal sense surrounded by the waters of the Colorado river flowing on either side of and around the same, and was not an island or any part of the bed of the Colorado river.

" '3. That at the time of the Decker grant and at all times since and now the main channel of the Colorado river has flowed and flows to the north of the land in controversy, and that the call on the river front of the Decker for the meanders of the river under the facts in this case means the meanders of the main channel of the river, and would therefore include the land in controversy in the Decker league.

" 'On each of the above conclusions of law, based on my findings of fact, I conclude that the state of Texas has parted with the title to the land in controversy, and can assert no claim to or control over the same itself or through its agents or lessees, and I have therefore held that the temporary restraining order heretofore granted should be dissolved, and that the prayer for perpetual injunction be in all respects denied.'

"On the request of appellant, the state of Texas, the court made the following additional findings of fact:

" 'Plaintiff has filed a motion requesting the court to file more explicit findings of fact in this case, the plaintiff taking exception to the use by the court of the word "slough" in its findings heretofore filed herein; and in response to said motion I hereby make the following additional findings:

" '(1) I find that at the earliest period that the tract of land in controversy was known to living witnesses said tract was cut off from the main body of land by a depression or channel which left the main channel of the river just below where Congress avenue crosses the river, and again connecting with the river 500 or 600 yards below. Said de-

pression or channel was between 25 and 30 feet in average width, had precipitous, high banks, and water flowed through it at times, and it was dry in places at times, as set out in the main findings of fact filed herein.

" 'It was not intended by the designation of this depression as a "slough" to designate its character; but the court in its main and supplemental findings had described what is believed to have been the actual conditions existing on the ground at the time, and reference is made to this description, rather than to its designation by any particular word.

" 'I further find that the Colorado river in 1835 was and at all times since has been more than 30 feet wide, and, in contemplation of law, a navigable stream.'

"On said findings and conclusions, and in accordance therewith, judgment was rendered against plaintiffs in favor of defendants, dissolving the temporary injunction theretofore issued, and that plaintiffs take nothing by their suit."

In addition to the statement copied from appellant's brief we deem it proper to add that in the judgment the trial court made specific findings of fact to the effect that all of the land in controversy was at the date of the Decker league grant in 1835 included within the boundaries of the field notes of that grant, and was not at that time any part of the bed of the Colorado river.

### Opinion.

[1-3] In the able brief filed by the Attorney General's department it is contended: First, that in as much as the state of Texas was the plaintiff in the court below, the burden did not rest upon it to show that title to the land in controversy had not been granted to some one else, but that the burden rested upon the defendants to show, as they attempted to do, that the land in controversy was embraced within the boundaries of the Decker grant; second, that under the laws existing in 1835 the channel of all navigable streams was reserved to the government, and that it being shown that at the time of the trial the land in controversy was an island surrounded by the Colorado river, the burden of proof was upon the defendants to show that it was not so surrounded at the time the Decker grant was issued; third, that the trial court did not find as a fact that the land in controversy was not so surrounded by the river at the time the grant referred to was issued; and, fourth, if that court made such finding it is not supported by, but is contrary to, the testimony.

If it be conceded that the first and second contentions referred to embody sound propositions of law, and are therefore correct, it does not follow that the case should be reversed, unless one or both of the other contentions are sustained by the record. Construing all of the findings and conclu-

sions of the trial court together, and especially the findings of fact embodied in the judgment, we think it is quite clear that it was the intention of that court to find as a fact that none of the land in controversy was within, or was any part of, the bed of the Colorado river in 1835, when the Decker grant was issued; and this conclusion narrows the case down to the fourth and last contention on behalf of the state, to the effect that the testimony does not sustain the finding of fact referred to. In other words, we think the court found as a fact that in 1835 the river had but one channel, and that the land in controversy bordered on that channel, and was therefore part of the Decker grant, and that finding is supported by testimony.

It is true that no witness testified as to conditions existing earlier than May, 1839, and it is also true that the oldest map that was produced tending to show those conditions appeared to have been made in 1839. The only witness who testified that he saw the land in controversy as far back as 1839 was Mr. John Darlington, who at the time he testified was 92 years of age; and it is not probable that any other witness could have been produced whose knowledge upon the subject extended further back than his. Mr. Darlington's testimony, together with certain maps introduced by the defendants, and the testimony given by Maj. Walton and Mr. Von Rosenberg as to conditions existing as far back as 1853, and changes that were wrought by the floods of 1867 and 1869, support the findings of fact filed as such by the trial judge; and the facts there found justify the further finding of fact, which was incorporated in the judgment, to the effect that at the time the Decker grant was made the land in controversy was no part of the river, and therefore was embraced in the Decker grant, which extended to the river. The trial court did not hold, nor do we hold, that the Decker grant extended to the middle of the river. It may be conceded that the channel of the river was reserved to the government, and not embraced in the Decker grant, but the land in controversy was no part of the channel of the river as the court found such channel to be when the grant was made. We have already stated that from the facts recited in the court's findings of fact it was permissible to infer that the same conditions existed four years prior to the time referred to in the findings. In other words, it is much more probable that the conditions which were shown to exist in 1839 existed in 1835, than to suppose that in 1835 the river was divided into two distinct channels, each of which was a part of the river, and that within four years' time the one on the south side had ceased to be a channel of the river and was in the condition described by the trial judge. The south channel of the river as it now exists was caused by the floods of 1867 and

1869, and it has so remained ever since that time; and the fact that it has so remained renders it improbable that it was a channel of the river in 1835, and ceased to be such channel in the short time which elapsed between that date and 1839.

As to the contention that a difference exists as to the sand bars and what is now known as the island, the answer is that the testimony does not indicate that any material difference existed in 1835. On the contrary, it indicates that at that time the so-called island and the sand bars were not separated by water, and comprised part of one body of land south of and adjacent to the river.

No error has been shown, and the judgment is affirmed. Affirmed.