L. V. MANRY v. J. T. ROBISON, COMMISSIONER OF THE GENERAL LAND OFFICE, ET AL.

No. 5388. Decided December 22, 1932.

(56 S. W., 2d Series, 438.)

214

216

*Ben H. Powell,* of Austin, for relator.

On the question of water remaining in the bed of an abandoned river bed being a fresh water lake: Humphreys-Mexia Company v. Arseneaux, 116 Texas, 603, 297 S. W., 225; Hoefs v. Short, 114 Texas, 501, 273 S. W., 785.

Manry in filing his application for permit with the Land Commissioner and complying with the statutes in that, has a vested right in the land. Campbell v. Wade, 132 U. S., 34, 33 L. Ed., 240; Steamship Co. v. Joliffe, 69 U. S., 450, 17 L. Ed., 805; Sherwood v. Fleming, 25 Texas Supl., 408.

*James V. Allred,* Attorney General, *Geo. T. Wilson* and *R. W. Yarborough,* Assistants Attorney General, *Rex G. Baker* and *John Q. Weatherly,* both of Houston, *Andrews, Streeman, Logue & Mobley* and *Homer Mabry,* all of Houston, for respondents.

It is axiomatic in the courts of Texas that in determining what was the civil law in force in Texas prior to 1840, we look first to the Partidas, then to the laws of the Indies, of Mexico, of Coahuila and Texas, and of the Republic of Texas, in order to determine whether or not the particular law of the Partidas in question has been modified by statute, decree, order or constitution. The commentaries by the various writers on the Spanish law are also of great benefit, but the Roman law and the various other civil codes based thereon are of only incidental value because of the successive conquests of Spain by Moor and Visigoth, and the subsequent prohibition of the use of the Roman law. See introduction to White's Land Law in California, Oregon, Texas, etc., also Introduction to Schmidt's Civil Law of Spain and Mexico.

Respondent Walker regards the question here raised as settled by the able opinion of this Honorable Court in the case of State v. Grubstake Inv. Assn., 117 Texas, 53, 297 S. W., 202.

"If a river or stream, whether navigable or not, opens itself a new bed by leaving its former channel, the owners of the soil newly occupied shall take, by way of indemnification, the former bed of the river, every one in proportion to the quantity of land he has lost." Strohecker v. Robinson, 147 La., 652, 85 So., 627.

The Republic of Texas and the State of Texas acquired title to all of the land within its boundaries, including beds of navigable streams, which had not been disposed of prior to the formation of the Republic of Texas.

Under the laws in force in the Mexican nation and in Coahuila and Texas in 1824 and 1828 grants from the sovereign adjoining a navigable river carried with them, as an incident to such grants, the rights in the owners of such grants to become the owners and to succeed to the title to the land in the bed of the river, in proportion to the extent of their estates upon the banks, upon the river abandoning its course by avulsion, such right passing as a part of the grants from the sovereign and upon the issuance of the grants becoming a vested right of the grantees, which right has at all times been protected by the various constitutions and laws of succeeding governments and is now protected by the Constitution and laws of this State and was so protected in 1914 when the bed of the Brazos River changed its course by avulsion, thereby vesting in the corespondents Sam Rosen, E. H. Hammond, The Sugarland Industries and Humble Oil & Refining Company the title to the abandoned bed of Brazos River in proportion to the extent of their estates upon the banks. State v. Grubstake Investment Assn., 117 Texas, 53, 297 S. W., 202; 2 Sayles Early Laws of Texas, Art. 1669; Law 31, Title 28, Third Partida; Constitution of the State of Texas, Art. 7, Secs. 2 and 4; Siddall v. Hudson, 206 S. W., 381 (application for writ of error dismissed); Western Pac. Ry. Co. v. Southern Pac. Ry. Co., 151 Fed., 376, 398-400; Molt v. Boyd, 116 Texas, 82, 286 S. W., 458, 466; Wright v. Straub, 64 Texas, 64; City of Galveston v. Menard, 23 Texas, 349; Landry v. Robison, 110 Texas, 295, 219 S. W., 819.

MR. CHIEF JUSTICE CURETON delivered the opinion of the court.

### STATEMENT OF THE CASE.

This action for original mandamus is by L. V. Manry, relator, against the respondent Walker, Commissioner of the

General Land Office, to require the issuance of a mineral permit to prospect for oil and gas, under the terms of designated statutes, upon 124.4 acres of land, embraced in an abandoned bed of the Brazos River, in Fort Bend County. The respondent Cooper seeks affirmative relief my way of mandamus to require the Commissioner to *sell* him the land under certain statutes and laws of the State. The respondents Sam Rosen, E. H. Hammond, Sugarland Industries, and Humble Oil & Refining Company oppose the issuance of both writs of mandamus, upon the ground that they severally own the land in controversy, and that the State has no power to either lease or sell the same. The respondent Walker contends that the land belongs to the State, but says that neither of the mandamuses prayed for should issue, for reasons which he sets forth in his pleadings.

The land involved is designated on the map attached as "L. V. Manry Sur. No. 1," a portion of which is occupied by water, as shown. This land formed a part of the bed and channel of the Brazos River prior to the year 1914. During the spring of that year, by an avulsive change, the river cut across the neck of the bend, straightened its course, abandoned the land shown as a bed, cut, and has since occupied, a new channel, indicated by the lines between which the words "Brazos River" appear.

Exhibit "E"

Exhibit "E"

Spring Branch

land Industries

S. M. WILLIAMS

E. ALCORN

The Sugarland Industries

E. H. Hammond

L. V. MANRY SUR. No. 1

Humble No 21244

ISLAND
HENRY JONES
LEAGUE
65 A.

Sam Rosen

Cottonwood Flat

127 + A.

Application for
Permit by L V. Menry
Houston Tex

Sand Bar

OLD RIVER BED

Sand Bar

BRAZOS

RIVER

56 5 A.

Andrus 4 A.

Coltone

WILLIAM LITTLE

Humble Oil & Ref. Co. Fee
(Mrs. Elizabeth Hamner)

The land involved is out of the Williams, Alcorn, Little, and Jones leagues, granted to Austin's colonists by Mexico prior to the Independence of Texas. All were riparian at the time except the Alcorn league. During the course of a century, however, the river by erosion cut into that league, and at the time of the avulsion in 1914 the river was touching all four of the surveys. All of the grants were, the relator states, "made in accordance with the laws then prevailing in the Mexican Nation, and passed to the respective grantees such rights, if any, to the bed of the Brazos River as would accrue to grantees from the Mexican Government under the laws then in force in that country." The Brazos River in the locality involved runs generally from the northwest to the southeast, and was in 1824, the date of the earliest grant, and at all times since has been, a navigable stream under the laws of Spain, Mexico, and Texas. The abandoned channel of the river, in the form of a "horse shoe bend," shown on the map, according to the pleadings, "has become a fresh water lake in the sense that during periods of high water practically all of the area included in said abandoned river bed is covered with water, while a large part of said abandoned river bed has water in it all the time; that the balance of said abandoned river bed, being on higher ground, has no water in it or upon it except during high floods; * *. * *that none of the area involved is within the tide water limits of the Gulf of Mexico.* (Italics ours).

OPINION.

■ The controlling question is whether or not the abandoned bed of the river is the property of the State or the property of the present owners of the Williams, Little, Jones, and Alcorn leagues. We have concluded that it is the property of the last named parties, and that the writs of mandamus should be refused. Our reasons for these conclusions will now be stated.

■ The rule is an elementary one that in determining the rights of holders of title under Mexican grants, the laws of Mexico in effect when the grants were made control. 9 Texas Jurisprudence, pp. 301, 302, 303, Secs. 4, 5; p. 304, Sec. 6; p. 315, Sec. 16; Mitchell v. Bass, 33 Texas, 260; Miller v. Letzerich, 121 Texas, 248, 49 S. W. (2d) 406, and authorities there cited; State v. Grubstake Investment Association, 117 Texas, 53, 297 S. W., 202; 4 Ruling Case Law, p. 83, Sec. 14; Smith v. City of Rochester, 92 N. Y., 463, 44 Am. St. Rep., 303; O'Fallon v. Daggett, 4 Mo., 343, 29 Am. Dec., 640. Under the laws of Mexico in effect at the time of these grants, the bed of the

Brazos River then occupied by it was the property of the government, and upon the change of sovereignty became the property of the Republic of Texas. State of Texas v. Grubstake Investment Association, 117 Texas, 53, 297 S. W., 202. Under the Mexican civil law that portion of the Alcorn league occupied by the river by erosion subsequent to the grant became the property of the sovereign. Las Siete Partidas, Part 3, Title 28, Law 31; Hall's Mexican Law, Sec. 1408; see also Mexican Code of 1871 in Hall's Mexican Law, Sec. 1698; authorities *post*. It is apparent, therefore, that according to the Mexican civil law *all* the property in controversy belonged to the State at the time of the avulsion in 1914.

■ When the river, however, abandoned its channel, the abandoned bed under the laws of Mexico became the property of the owners of the riparian or adjacent lands. Hall's Mexican Law, Secs. 1399, 1408; see also Sec. 1698; Johnston's Civil Law of Spain, p. 102; Schmidt's Civil Law of Spain and Mexico, p. 50, Art. 214; White's New Recopilacion of the Laws of Spain, etc., Vol. 1, p. 90; Las Siete Partidas, Part 3, Title 28, Law 31; State v. Grubstake Investment Association, 117 Texas, 53, 297 S. W., 202; Farnham on Waters, Vol. 1, Sec. 49.

Hall's Mexican Law in part declares:

"Sec. 1399. Beds of Streams.—*The bed, mother, or ground where the running waters go must be divided between the riparian proprietors according to the frontage of their estates, in case of remaining dry through the effect of the weather, by any event of vis major, act of God, or by the change of the course of the water.*"

"Sec. 1408. Change of the Course of the River—Overflows—Increase of Land.—*If a river changes its course for a new place, leaving the old one dry, this will be of the owners of the immediate estates, each one taking so much thereof as may be equal to the frontage of his estate; and the owners of those where it newly runs lose the dominion of the new bed, by its being made public as the river, and as the bed which is abandoned was.*" (Italics ours).

The other Mexican and Spanish authorities cited, including the Partidas, state the rule in the same manner as Hall.

Associate Justice Greenwood, in the Grubstake Investment Association case, supra, quotes the rule from the Partidas, and analyzes and applies it in a manner which conclusively shows that a river bed, under the Mexican civil law, upon abandonment becomes the property of the adjacent land owners.

■ The Roman law, including the Institutes of Justinian, was the basis of the Partidas and the laws of Spain and Mexico. Under the Roman law the ownership of river beds, while still occupied as such, seems to have been involved in some doubt. The American courts, however, have generally regarded it as placing the title to the soil beneath running water in the public. Farnham on Water Rights, Vol. 1, Sec. 49; State v. Grubstake Investment Association, supra; Buckland's Roman Law, pp. 212, 213; Canal Appraisers v. People, 17 Wend. (N. Y.), 571. But as to the ownership of the *abandoned beds* of rivers, the Roman law left no room for doubt. Under that system of laws the abandoned beds of rivers became the property of the riparians. Moyle's Institutes of Justinian, p. 35; Scott's Civil Law, Vol. 9, pp. 156, 157, 167, 174 (Justinian's Digest); Bowyer's Modern Civil Law, p. 85; Dropsie's MacKeldey's Roman Law, Sec. 271; Canal Appraisers v. People, 17 Wend. (N. Y.), 571, 596; Dwinel v. Barnard, 28 Me., 554, 569; Farnham on Waters, Vol. 1, Sec. 49.

That the land in controversy under the Mexican civil law became the property of adjacent land owners, upon its abandonment by the river, in view of the authorities, we believe, does not admit of any doubt. It is urged, however, that the adoption of the common law in 1840 made a different rule of decision applicable with respect to the rights here involved.

The Act of 1840 adopted the common law as the rule of decision, and repealed the laws of Mexico, "except such laws as relate exclusively to grants and the colonization of lands in the State of Coahuila and Texas," etc. Gammel's Laws, Vol. 2, pp. 177, 178.

The insistence is made that under this Act the Mexican civil law, which vested the title to abandoned river beds in the adjacent land owners, was repealed, and that since the river bed in the instant case was not abandoned until 1914, the rule of the common law should apply, and not that of the Mexican civil law. With this view we can not agree.

■ The grants involved in suit are all colonization grants, being within and a part of Austin's Colony. Each grant recites that the grantee was put "in possession of said lands *with all their uses, customs, privileges, and appurtenances,* for him, his heirs and successors," and as to all, except the Alcorn league, there was included in the above clause "entrances and outlets." These rights thus embraced within the grants were sedulously preserved to the grantees by the Constitution and laws of the Republic of Texas. The laws under which the grants were made,

including the Mexican civil law, were continued in force by the Constitution adopted on March 16, 1836, and ratified by the people in September following. Schedule to the Constitution of 1836, Sec. 1; 1 Gammel's Laws, p. 1077; Motl v. Boyd, 116 Texas, 82, 104, 286 S. W., 458.

Sections 7 and 13 of the Declaration of Rights of the Constitution of 1836 prohibited the denial of any privilege or the taking of any property except by due process of law. 1 Gammel's Laws, p. 1083. Can it be doubted that the lands granted to the remote grantors of the relators Rosen et al., "with all their *uses, customs, privileges and appurtenances,*" are within these protective clauses of the Constitution, and that any Act of the Congress of the Republic attempting to deprive the grantees of their lands, or any use, custom, privilege, etc., embraced within their grants, would have been void? We think not. Nor did the Congress of the Republic attempt to do so by the adoption of the common law as the rule of decision. This Act, as we have seen, although repealing the Mexican laws, specially excepted from the repealing provisions certain laws then in force, including the Mexican law relating exclusively to grants and the colonization of land. The exceptions were intended to embrace all rights comprehended by the Mexican colonial grants, including the rights of riparians. Motl v. Boyd, 116 Texas, 82, 102, 286 S. W., 458.

The Mexican colonization grants were confirmed from time to time by the Republic of Texas, and the Constitutions of 1845 and 1876 each provided that rights of property acquired under the Constitution and laws of the Republic of Texas (which necessarily included the Mexican civil law down to 1840) should not be divested, but *"the same shall remain precisely in the situation which they were before the adoption of this Constitution."* Motl v. Boyd, 116 Texas, 82, 105, 286 S. W., 458; Constitution of 1845, Art. 7, Sec. 20; Constitution of 1876, Art. 16, Sec. 18.

The rights of the Mexican grantees as they existed on March 2, 1836, were likewise preserved to them by the treaty of Guadalupe Hidalgo. Thorpe's American Charters, Vol. 1, p. 389. Against the conclusion stated above, it is urged that the right of the riparians to succeed to the title of a river bed upon its abandonment by the river, *was not a property right,* but *a mere rule of law* under which a property right would not vest until the river had actually abandoned its bed; and, therefore, not within the exceptions to the repealing provisions of the Act of 1840, nor the protective clauses above cited from the Con-

stitutions of the Republic and State. With that insistence we can not agree. It is true that the avulsive change by which the bed of the river was abandoned did not occur until 1914, but we think the right of the riparians to succeed the State in title to the river bed by reason of such occurrence was a vested one, part of the original grants when they were made by the Government of Mexico, just as were the rights to alluvion by accretion and adjacent soil uncovered by reliction.

■ The authorities all agree that under both the civil law (including the Mexican civil law) and the common law, when a river by erosion occupies land previously unoccupied by it, the owners lose title,—that is, the boundary line between the coterminous estates follows the movement of the stream, with the result that one owner loses land by erosion, and the other acquires land not previously owned by him, by accretion or reliction. This has been the established law of civilized nations since the Institutes of Gaius were written, nearly 1800 years ago. Denny v. Cotton, 22 S. W., 122 (writ refused); Rosetti v. Carmille, 199 S. W., 526 (writ refused); Arkansas v. Tennessee, 246 U. S., 158, 173; Thompson on Real Property, Vol. 3, Secs. 2440, 2441; 45 Corpus Juris, p. 524, Sec. 192; Angell on Watercourses (6th ed.), Secs. 53 to 57; Gould 'on Waters (3rd ed.), Secs. 155, 162; Farnham on Water Rights, Vol. 1, Secs. 69, 70; Vol. 3, Secs. 845, 846; 4 Ruling Case Law, p. 88, Sec. 19; Kent's Commentaries (13th ed.), Vol. 3, p. 597 (428); Cooley's Blackstone (3rd ed.), Vol. 1, pp. 479, 480 (261); Coulson & Forbes on Waters, pp. 36, 80, 93; Halsbury's Laws of England, Vol. 28, p. 362, Secs. 658 to 661; Hall's Mexican Law, Secs. 1408, 1694; Siete Partidas, Part 3, Title 28, Law 26; Johnston's Civil Law of Spain, pp. 101, 102; Schmidt's Civil Law of Spain and Mexico, pp. 49, 50; Moyle's Institutes of Justinian, Book 2, Title 1, Sec. 20, p. 38; Scott's Civil Law, Vol. 9, pp. 156, 157 (Justinian's Digest); Vol. 1, p. 119 (Institutes of Gaius); Grotius' Rights of War and Peace, Chap. 3, Secs. 7, 8.

■ These rules obviously affect property rights, and the courts, with practical unanimity, agree that the rights of alluvion by accretion and to soil uncovered by reliction are vested property rights, part of the original grant, of which the owner cannot be deprived by legislative enactment. Thompson on Real Property, Vol. 3, Secs. 2445, 2441; 45 Corpus Juris, pp. 525, 526, Sec. 192; Farnham on Waters, Vol. 1, Secs. 63, 66, 69, 70, 70a, 71; Vol. 2, Secs. 845, 846; Gould on Waters (3rd ed.), Secs. 148, 155, 156; 27 Ruling Case Law, p. 1071, Secs. 11, 12, 13, 14; St.

Clair Co. v. Lovingston, 23 Wall. (U. S.), 46; Municipality v. Orleans Cotton Press, 18 La. (O. S.) 122, 36 Am. Dec., 624; Meyers v. Mathis, 42 La. Ann., 471, 21 Am. St., 385; Freeland v. Pa. R. Co., 197 Pa., 529, 58 L. R. A., 206; Brundage v. Knox, 279 Ill., 450, 117 N. E., 123; Kennedy v. Municipality, 10 La. Ann., 54; Massachusetts v. New York, 271 U. S., 65; Stevens v. Arnold, 262 U. S., 266; McGill v. Thrasher, 221 Ky., 789, 299 S. W., 955 (Ky.); Hohl v. Iowa Cent. R. Co., 162 Ia., 66, 143 N. W., 850; Hinckley v. Peay, 22 Utah, 21, 60 Pac., 1012; Barrett v. New Orleans, 13 La. Ann., 105; White v. Leovy, 49 La. Ann., 1660, 22 So., 931; Knudsen v. Omanson, 10 Utah, 124, 37 Pac., 250; Patterson v. Gelston, 23 Md., 432; Washougal & L. T. Co. v. Dalles, P. & A. Nav. Co., 27 Wash., 490, 68 Pac., 74; Stern v. Fountain, 112 Ia., 96, 83 N. W., 826; Baltimore & O. Ry. Co. v. Chase, 43 Md., 23; Hagan v. Campbell, 8 Porter (Ala.) 9, 33 Am. Dec., 267; Yates v. Milwaukee, 10 Wall. (U. S.), 497; Cooley's Blackstone (3rd ed.), Vol. 1, pp. 479, 480; Kent's Commentaries (13th ed.), Vol. 3, p. 597.

The authorities cited to the contrary, Western Pacific Ry. Co. v. S. P. Co., 151 Fed., 376; Eisenbach v. Hatfield, 2 Wash., 236, 26 Pac., 539, 12 L. R. A., 632, and Taylor v. Underhill, 40 Calif., 471, are of no value in this discussion. The first declined to follow the Supreme Court of the United States. The second is not only contrary to the general rule, and in conflict with the Supreme Court, but is condemned by a dissenting opinion of one of the judges of the Court which rendered it, as standing alone in English jurisprudence with its conflicting doctrine. The third case is not in point.

We regard the question as settled that the rights of the riparian to alluvion by accretion and soil left bare by reliction are vested property rights.

■ "Cut-offs" and the abandonment of their beds by rivers are as much the result of the natural processes of rivers as are *erosion, accretion,* and *reliction.* Cleland's Geology, Chap. 4, pp. 119 to 122; Grabaw's Geology, Part 1, pp. 416, 417; Tarr & Martin's Physiography, Chap. 6, pp. 146 to 151; Salisbury's Physiography, Chap. 4, pp. 87 to 89; Thomas & Watt on Improvement of Rivers, Vol. 1, pp. 11 to 29. The former ought reasonably to be regarded in the same light as the latter; and the right to the soil left bare by abandonment, declared by the civil law to be in the riparians, should be held to be a *property right,* embraced in the original grant like the right to alluvion and the soil left bare by reliction. By the Mexican civil law and the Roman law it was so regarded. The Institutes and Di-

gest of Justinian, the Partidas, and the Spanish and Mexican civil law all treat the right of the riparian to succeed to the title of abandoned river beds as a property right, in the same manner and to the same extent that they do the rights of alluvion by accretion and to soil left bare by reliction. Each is referable to the *right of property by accession*, a principle of the law of property under the civil law, declared by Justinian 1300 years ago, and by Gaius nearly eighteen centuries past. Scott's Civil Law, Vol. 9, pp. 156, 157, 159 (Justinian's Digest); Moyle's Institutes of Justinian, pp. 35, 38, 39; Las Siete Partidas, Part 3, Title 28, Law 26; Hall's Mexican Law, Secs. 1399, 1408, 1670, 1702; Buckland's Roman Law, pp. 210, 212; Morey's Outlines of Roman Law, pp. 304, 305; MacKeldey's Roman Law, Secs. 166, 272, 274; Phillimore's Roman Law, p. 142; Grotius' Rights of War and Peace, Chap. 3, Secs. 7, 8; Bowyer's Civil Law, pp. 81, 82, 85; Johnston's Civil Law of Spain, pp. 98, 101, 102; Schmidt's Civil Law of Spain and Mexico, Arts. 205 to 216; White's New Recopilacion of the Laws of Spain, etc., Vol. 1, pp. 83, 90.

The rule of title to property by accession is as well established under the common law as under the civil law, and under the common as under the civil applies to alluvion by accretion, and to soil left bare by relicition. Texas Jurisprudence, Vol. 1, p. 239; 1 Corpus Juris, p. 382; Isle Royale Min. Co. v. Hertin, 37 Mich., 332, 26 Am. Rep., 520; Lampton v. Preston, 1 J. J. Marsh. (Ky.), 454, 19 Am. Dec. 104; Pulcifer v. Page, 32 Me., 404, 54 Am. Dec., 582; Silsbury v. McCoon, 3 N. Y., 379, 53 Am. Dec., 307; Hale's De Jure Maris in Moore's History of the Foreshore (3rd ed.), p. 399; 2 Kent's Commentaries, p. 361; Bacon's Abridgment, Vol. 8, p. 22. Corpus Juris states:

"The doctrine of accession has been recognized from a very early date. It was recognized by the Civil Law, from which the rules and principles now recognized were principally derived, and was later introduced into the Common Law of England, and has since become a recognized part of the jurisprudence of the United States."

Our common law rules of alluvion and reliction, and the law of waters generally, were in a large measure derived from the Roman law. Cooley's Blackstone (3rd ed.), Vol. 1, pp. 479, 480; Kent's Commentaries (13th ed.), Vol. 3, pp. 591, 598; Farnham on Waters, Vol. 1, Sec. 36; Dwinel v. Barnard, 28 Me., 554, 569; Scott's Civil Law, Vol. 1, p. 119; note,—see also pp. 36, 37, 38; Plucknett's History of the Common Law, pp. 180 to 183, 210 to 215; Holdsworth's History of English Law, Vol.

2, pp. 266 to 286; Rex v. Yarbarough, 2 Bligh's New Reports, 147, 4 Eng. Reprint., 1087; Foster v. Wright, 4 C. P. D., 438, 447.

Since the common law rights to alluvion by accretion and soil left bare by reliction were derived from the civil law, and are held to be vested rights under the rule of property by accession, it is obvious, we think, that the civil law rule of *title by accession to abandoned river beds* in favor of the riparians must likewise be regarded as a vested property right.

Not only are the several rights derivable from the same natural law of river meandering, and subject to the same civil law rule of title by accession, but the legal nature of the titles involved is similar under the common law.

In the event a river by erosion and accretion, or by the ordinary process of reliction, changes its bed, one adjacent owner loses title and the other gains, and the sovereign, as the proprietor of the changed river bed, obviously takes title to land previously granted by the State by right of reverter. The riparian who gains does so by the law of accession, and he who loses does so because the title originally held by him adjacent to the river and subject to its erosive effect was a base fee, determinable upon the occupancy of his soil by the river. Authorities cited below.

■ In the instant case, under the civil law, the State as the successor in title to the Republic of Mexico to the land involved, so long as the Brazos River occupied it, held same under a title within the definition of a base or determinable fee,—that is, its title, while an estate in fee, was in fact a base or qualified one, determinable in favor of the riparians upon the abandonment of the bed by the river. Kent's Commentaries (13th ed.), Vol. 4, p. 8; Cooley's Blackstone (3rd ed.), Vol. 1, p. 385; Stephens County v. Mid-Kansas Oil & Gas Co., 113 Texas, 160, 173, 254 S. W., 290.

We are, therefore, of the opinion that the right of the riparians to succeed to the title of the abandoned bed of the river here involved is, and was, a property right, within the exceptions to the repealing Act of 1840, and within the protection of the due process clauses of our several Constitutions, and of the provisions of the treaty of Guadalupe Hidalgo.

■ Under the Mexican civil law, by which we believe we must be governed, the land in controversy does not belong to the State, but to the holders of title under the original Mexican grants. We are convinced, however, that the rule of the com-

mon law, which we adopted in so far as applicable to streams *above tidewater,* was, and is, similar to the Mexican civil law; and in so far as the rights of the parties here are concerned, the same result is reached by its application.

■ Under the English common law the sovereign owned only those portions of river beds which were within tidewater limits. River calls extended to the medial line of boundary streams *above tidewater* whether navigable or not, and the beds were the property of the riparians. Hardin v. Jordan, 140 U. S., 371, 383, 388; Shively v. Bowlby, 152 U. S., 1, 11; 4 Ruling Case Law, p. 82, Secs. 12, 13, p. 83, Sec. 15; 9 Corpus Juris, p. 184, Sec. 60, p. 185, Sec. 61; Farnham on Water Rights, Vol. 1, Sec. 48, Vol. 2, Secs. 413, 415; Kinkead v. Turgeon, 74 Neb., 580, 109 N. W., 744, 121 Am. St. Rep., 740; 27 Ruling Case Law, p. 1358, Secs. 268, 292; 9 Corpus Juris, p. 184, Sec. 59, p. 185, Secs. 61, 63; Packer v. Bird, 137 U. S., 661, 666; Lorman v. Benson, 8 Mich., 18, 77 Am. Dec., 435; Kent's Commentaries (13th ed.), Vol. 3, pp. 592, 593; Coulson & Forbes' Law of Waters (in England), pp. 91, 77; Halsbury's Laws of England, Vol. 28, Secs. 744, 756, 757.

■ The beds of navigable streams *above tidewater* were parts of the coterminous estates, but so long as occupied by navigable waters the ownership and control by the owners was limited by the public right of navigation, predicated upon custom, dedication, or Act of Parliament, but not upon original ownership and control by the sovereign, nor upon the common law. Halsbury's Laws of England, Vol. 28, p. 406, Sec. 784, p. 398, Secs. 760, 761, 762, p. 396, Sec. 756; Coulson's & Forbes on Waters (4th ed.), p. 450; Hale's De Jure Maris as published in Moore's History and Laws of the Foreshore, etc. (3rd ed.), p. 370 et seq.; Farnham on Waters, Vol. 1, Sec. 48; Kinkead v. Turgeon, 74 Neb., 580, 121 Am. St. Rep., 740, 743.

■ In the *tidewater sections* of navigable streams the King, it is said, owned the rivers, including the beds, but held them in trust for the public. Coulson & Forbes on Waters (4th ed.), pp. 77, 78, 449; Halsbury's Laws of England, Vol. 28, p. 392, sec. 744, p. 400, secs. 767 et seq.; Farnham on Waters, Vol. 1, Secs. 37a, 38, 23f; Gould on Waters (3rd ed.), Secs. 4, 17, 18, 19, 20. For the history of the long controversy over this subject, see Moore's History of the Foreshore (3rd ed.), which reprints the Digges' pamphlet and Hale's De Jure Maris. This ownership, however, was based, not upon navigability alone, *but upon the sovereign's ownership of the sea.* In so far as

the tide ebbed and flowed, the rivers were regarded as arms of the sea, and since the King was lord of the sea, he was proprietor of the land beneath it. Authorities supra; Gould on Waters (3rd ed.), Secs. 42, 43, 44; Hale's De Jure Maris as reprinted in Moore's Law of the Foreshore, above cited, pp. 248, 378 to 380; Bacon's Abridgment, pp. 14, 18, 19, 22; The Case of the Royal Fishery of Banne, Davie's Reports (1762), pp. 149, 152.

Such in brief were the English common law rules as to the ownership of river beds when we adopted that system of laws as the rule of decision.

■ There can be no doubt but that the laws of England with reference to rivers were founded upon the Roman law. Authorities *supra* and *post;* Hardin v. Jordan, 140 U. S., 371, 390. The two systems of law were similar in many respects, but differed in some material particulars. Under the civil law all perennial streams were public, while under the common law navigable streams within tidewater limits only, in the absence of prescription, dedication, or Act of Parliament, were public. Authorities *supra;* Gould on Waters (3rd ed.), Secs. 51, 52, 53; Coulson & Forbes on Waters (4th ed.), pp. 77, 78, 449, 450; Halsbury's Laws of England, Vol. 25, p. 398, Sec. 760; Hardin v. Jordan, 140 U. S., 371, 383.

There is a difference of opinion among writers on the Roman law as to whether or not the beds of public streams under that system of jurisprudence belonged to the sovereign or to the owners of adjacent lands.

England in adopting the Roman law as to its *nontidal* streams adopted the construction insisted on by Selden, Vinnius, Mr. Farnham (Vol. 1, Sec. 49), and others, that the title of the riparians extended to the center of the streams, because that construction was suitable to her conditions; while France, Spain, and Mexico adopted that interpretation indicated by Gauis (Scott's Civil Law, Vol. 9, p. 107), and followed generally by the American courts (Farnham, Vol. 1, Sec. 49), that title to the beds of all navigable streams, so long as occupied, was in the public or the sovereign, because that construction was suitable to their conditions.

■ Each of the nations named in selecting its interpretation of the Roman law as to the ownership of stream beds, so long as occupied, chose that rule which was best suited to its conditions. *The jurisprudence of all the nations mentioned, France, Spain, Mexico, Texas (down to 1840), and England (as to non-*

*tidal streams), however, agree with the Roman law, that when a river abandons its bed and selects a new channel, the abandoned bed becomes the property of the adjacent land owners.* Authorities supra; Farnham on Waters, Vol. 1, Sec. 49.

■ The status of the law in Texas when we adopted the common law as the rule of decision in 1840 was as follows: Texas owned the beds of all *perennial streams, regardless of navigability,* whether grants of land adjacent were made by Spain and Mexico prior to March 2, 1836, or by the Republic of Texas prior to the Act of 1837, *by virtue of the civil law of Mexico.* Hall's Mexican Laws, Secs. 1390, 1406; Angell on Watercourses (6th ed.), Sec. 550; State v. Grubstake Investment Association, 117 Texas, 53, and authorities there cited. The Republic also owned the beds of all streams touching grants made subsequent to that date and prior to the Act of 1840, *whether perennial or not,* where the beds were as wide as 30 feet, under the Mexican civil law as modified by the Act of 1837. *As to the beds of all these streams adjacent to grants by the sovereignties named, the State had a determinable fee, which under the laws existing until the adoption of the common law would pass upon abandonment to the riparian proprietors.*

■ It is obvious, we think, from the foregoing that, there was no rule of the common law touching the subject before us when we adopted that system, which in all respects could be harmoniously incorporated into our system of jurisprudence. We are constrained to believe that the Congress of the Republic, in adopting the common law as a rule of decision, did not intend to adopt any rule of that system of jurisprudence *applicable alone to the beds of streams within tidewater limits* and apply it to thousands of miles of navigable and innavigable streams above the flow of the tide, in such manner as to enlarge the title of the State to the beds of streams from a base fee to an indeterminable fee simple title, either as to lands previously or subsequently granted. The common law was adopted only in so far as applicable to our Constitutions. Constitution of the Republic, Art. 4, Sec. 19; 9 Texas Jurisprudence, pp. 306 to 312, Secs. 8, 9, 10, 12. The common law rule, in so far as it conflicted with the determinable fee title held by the State in river beds, and in so far as it denied *title by accession to the riparian owners, when rivers abandoned their beds,* was clearly not applicable to grants made prior to its adoption in 1840, and no change in the right of accession to abandoned river beds was intended or wrought as to such prior grants by its adop-

tion. As we have previously shown, the statute adopting the common law expressly exempted therefrom colonization grants by Mexico. The Act of 1837 was not specifically amended by the Act of 1840, nor by any subsequent law, and in the absence of some specific amendment we should give it the meaning which it had at the time of its enactment. 25 Ruling Case Law, p. 959, Sec. 214; United States v. Union Pac. R. Co., 91 U. S., 72; Schulyer Co. v. Thomas, 98 U. S., 169; Platt v. Union Pac. R. Co., 99 U. S., 48, 63.

■ Although we adopted the common law as a rule of decision in 1840, we have disregarded its provision that the public right of navigation above tidewater was dependent on grant or custom, and have applied the civil rule of navigability in fact. Welder v. State, 196 S. W., 868; Orange Lumber Co. v. Thompson, 59 Texas Civ. App., 562, 126 S. W., 604; Jones v. Johnson, 6 Texas Civ. App., 262, 25 S. W., 650. In truth, the civil law rule has, in effect, become the common law throughout the United States. 45 Corpus Juris, p. 406, Sec. 2, and cases cited in the notes; Havre de Grace v. Harlow, 129 Md., 265, 272, 98 Atl., 852; 27 R. C. L., p. 1302, Sec. 213. Subsequent to the adoption of the common law, we have ignored its rule that grants on streams above tidewater carry title to the thread of the stream, and have continued to apply the civil law rule, of which the Act of 1837 is an adaptation, to the effect that the beds of streams there defined are the property of the State. City of Austin v. Hall, 93 Texas, 591, 57 S. W., 563; State v. Macken, 162 S. W., 1160; Burr's Ferry, B. & C. Ry. Co. v. Allen, 164 S. W., 878; State v. Grubstake Investment Association, 117 Texas, 53. The obvious reason for these departures from the common law is that our conditions were such, and our established jurisprudence such, that the rules of the common law in the respects named were inapplicable. To illustrate: England is a pluvial country where irrigation and general access to running water are not matters of serious concern. Much of Texas, like Mexico and portions of Spain, is an arid or semi-arid region, where irrigation is highly desirable, sometimes a necessity, and access to water for its vast herds of livestock a matter of great importance. The civil law, therefore, which retained title to the beds of *all perennial streams* in the State, so that the impounding and distribution of waters might be better effectuated, was better suited to our conditions than the rule of the common law. Millions of acres of our lands had previously been granted under the Mexican law and the Act of 1837. The continuance of the civil law rule, therefore, avoided

the conflict and discrimination which an application of the common law to grants made subsequent to 1840 only would have entailed.

These illustrations suffice to show that as to the law of streams we have only adopted such rules of the common law as are suitable to our conditions and as are in harmony with the basic principles of our jurisprudence with reference to the law of waters.

We will now examine the question as to whether or not we have adopted the *claimed* common law rule that the beds of all navigable streams upon abandonment are the property of the State.

■ No such rule ever existed under the common law of England. There are respectable authorities for the statement that the beds of navigable streams *within tidewater limits* upon abandonment remain the property of the Crown; but this is because the rivers and their beds where the tide ebbs and flows *are arms of the sea,* and not because of navigability alone. Authorities *supra;* Bacon's Abridgment, Vol. 8, pp. 14, 19; Farnham on Waters, Vol. 1, Sec. 38; Hale's De Jure Maris in Moore's History of the Foreshore, etc. (3rd ed.), pp. 378 to 380; Mayor of Carlisle v. Graham, L. R. 4 Ex., 360.

The rule of the common law as to rivers above tidewater, which are, as Bacon's Abridgment says, *"no original part or appendix of the sea,"* was, and is, that the adjacent lands extend to the medial line, burdened with certain easements incident to navigation, if navigable, and that upon abandonment the beds in full title pass to the riparian owners. Authorities *supra;* Bacon's Abridgment, Vol. 8, p. 14; Farnham on Waters, Vol. 1, Sec. 48; Hale's De Jure Maris in Moore's History of the Foreshore, etc. (3rd ed.), pp. 370 to 373; Kinkead v. Turgeon, 74 Neb., 580, 121 Am. St. Rep., 740.

■ In our opinion, in adopting the common law we adopted the last named rule, since the rule to the extent that it assigned the beds of nontidal navigable streams upon abandonment to the riparians was consistent with our then established system of jurisprudence, and better suited to our conditions than the other rule of the common law stated above.

■ We know judicially that under the Act of 1837, which modified both the common and civil law rules, we have thousands of miles of river beds owned by the State, which the State would not have owned under either the common or civil law but for the modification. These streams run for thousands of

miles through alluvial plains, where "cut-offs" and abandonment of beds, some small and some large, are of common occurrence. We cannot conceive that it was ever the legislative purpose to adopt the common law rule insisted on here, applicable in England only within tidewater limits, and assign abandoned river beds to the State, and thereby place title in the State to small tracts of land up and down our stream-ways, with the attendant injustice and inconvenience to riparian land owners and the persistent controversies which would necessarily arise. Speaking of the injustice of such a rule as that insisted on here, the Supreme Court of Nebraska, in the case of Kinkead v. Turgeon, 74 Neb., 580, 121 Am. St. Rep., pp. 740, 749, in part said:

"As was said long ago by Ulpian: 'In like manner if a river leaves its bed and begins to flow elsewhere, whatever is done in the old bed is not subject to the interdict, because not done in a public river, as the bed belongs to the neighbors on each side, or else the bed belongs to the occupant if he has fields marked off thereon. Certainly the bed ceases to be public. Also the new channel which the river has made, although it was private, begins, nevertheless, to be public, because it is impossible that the channel of a public river should not be public'; Ware on Roman Water Law, sec. 22. To hold otherwise in case of a stream of the characteristics of the Missouri river might well lead, by way of repeated changes of the river's channel, to additions to the public domain at the expense of adjoining proprietors. For example, if in this case we should hold that the bed of the abandoned stream belonged to the state of Nebraska, by the same reasoning the bed of the new channel belongs to the state, and if the river should again change its channel near by, by another avulsion, thus leaving the new bed dry, the state then would be the owner of the land in two abandoned river beds and also of the bed of the new channel. The property in the second and third bed then would be wrested without compensation from the property of private individuals. *A doctrine which might work such an injustice as this ought never to be adopted by a court if any other view is reasonable.*" (Italics ours).

We know from one of the most oppresisve and tragic chapters in the history of English jurisprudence how the titles of land owners would be clouded and litigation fostered by the adoption of the rule that abandoned stream beds become the property of the State. We refer to the history of the origin, emergence, and development of the current English common law doctrine that title to the foreshore of the sea and tidal

navigable rivers, and of *derelict* lands arising therefrom, is *prima facie* in the Crown.  See generally Moore's History and Law of the Foreshore and Seashore (3rd ed.); Farnham on Water Rights, Vol. 1, Secs. 39 to 43.

In the United States there are authorities which support the claim of the State to abandoned beds of navigable rivers.  Rees v. McDaniel, 115 Mo., 145, 21 S. W., 913; Nothstine v. Feldmann, 298 Mo., 365, 250 S. W., 589; Cooley v. Golden, 117 Mo., 33, 21 L. R. A., 300; Stockley v. Cissna, 119 Tenn., 135, 104 S. W., 792; State v. Muncie Pulp Co., 119 Tenn., 47, 104 S. W., 437.  These authorities, however, apply the rule above tidewater, which was clearly not admissible under the English common law.  They are not in point on the establishment of a common law rule that abandoned beds of navigable streams above tidewater are the property of the State.  They furnish an argument, of course, to the effect that since the State owns the occupied beds of rivers, the abandoned beds should belong to the sovereign.  But, as we have seen, the policy of our State, at least down to 1840, was to the contrary, as were the Roman, French, Spanish, and Mexican laws.

What was said by the Court of Civil Appeals of Texas in the case of Siddall v. Hudson, 206 S. W., 381 (no writ of error applied for), tends to support the State's claim.  This case, however, is so obviously erroneous as not to be an authority for any purpose.  The river bed in that case was abandoned while Texas was a part of Mexico (201 S. W., 1031), and plainly became the property of the riparian owners under the Mexican law.

Angell on Watercourses (6th ed.), Sec. 58, lays down the general rule with reference to the abandoned wells of navigable strams, which we think applicable in Texas.  The writer states:

"When we treat of such watercourses as are public highways, it will appear that a river of this description, by constituting to itself a new channel, may convert a private field into public property; that is, the new channel becomes public for use and accommodation, and cannot be impeded or obstructed. So on the other hand, a river, by changing its course, may cause the channel, which was before subject to the right of the public, to vest entirely and exclusively in the owners of the banks. The law of England, in relation to this subject, also appears to have been copied from the Roman law."

See also Dwinel v. Barnard, 28 Me., 551; Kinkead v. Turgeon, 74 Neb., 580, 121 Am. St. Rep., 740, 742. This rule quoted

from Angell is the same as the Mexican civil law rule, and is the rule, we think, which we adopted by the Act of 1840.

■■ For all the reasons stated, we hold that the claimed rule of the common law, that the abandoned beds of tidal rivers become the property of the sovereign, was not adopted in this State *as to our streams above the ebb and flow of the tide;* but that the other clear rule of the common law, that abandoned river beds are the property of the riparian owners, regardless of navigability, should be applied to all our streams above tidewater, navigable in fact or in law,—a rule in entire harmony with the Mexican civil law. This makes all our grants, whether Mexican or subsequent, subject to the same rule, and prevents confusion, inconvenience, and discrimination between owners of grants made prior to the Act of 1840 and those made since that date.

■ The fact that the Alcorn league was not originally riparian, but subsequently became so, does not prevent the application of either the Mexican or common law rule named above. The Mexican civil law makes no exception in such a case. So long as the river occupies his land, it is the property of the sovereign. Upon abandonment, title to the bed passes to the riparian. Authorities *supra.* The rule of the common law is that where the river changes its course, and touches land not originally adjacent to it, the newly washed lands thereby becomes riparian, and upon a re-change of the river, in the absence of a previous shift of boundary by accretion, the owner takes title to his original boundary line. Gould on Waters (3rd ed.), Sec. 155, p. 308; Farnham on Waters, Vol. 3, Sec. 848; Minton v. Steele, 125 Mo., 181, 28 S. W., 746; Mayor of Carlisle v. Graham, L. R. 4 Ex., 360, 367, 370.

■ The insistence is made that the State owns the land beneath the waters of the ox-bow lake or body of water shown on the map because of its occupancy by the lake waters. There is no merit in this contention. Lakes of this character are always formed, and for a time exist in all abandoned river beds. They are universal characteristics of this natural phenomenon. Cleland's Geology and other scientific authorities supra.

The authors of the Partidas and the Mexican civil law, in the nature of things, were just as well acquainted with this feature of river change as we are today. The Mexican civil law and the Partidas make no exception as to lake beds of this character when a river abandons its channel, and therefore we can make none. The whole bed, when the river departed from it,

became the property of the adjacent land owners, and the fact that a portion of it has since been occupied by still water as a lake can not affect the title. Even under the common law, unless there existed a statute to the contrary when grants were made, titles of the riparians extended to the land beneath lake waters. Halsbury's Laws of England, Vol. 25, p. 398, Sec. 764; Coulson & Forbes on Waters (4th ed.), p. 100; 4 Ruling Case Law, p. 94, Sec. 26, and cases cited in note 2; 9 Corpus Juris, p. 183, Secs. 56, 57. Whether or not the lake is riparian water, and subject to the laws relating to fresh water lakes, as to fishing, etc., are questions not before us. The title to the lake bed, like that of the remainder of the abandoned channel, is in the riparian claimants.

The effect of this opinion is to be confined to abandoned stream beds above the ebb and flow of the tide. What rule should be applied to relicted lands below tidewater is not before us, and no opinion is expressed thereon.

For all the reasons given in this opinion, we have concluded that the adjacent land owners, subsequent grantees of Williams, Little, Jones, and Alcorn, own the land in controversy, and the State has no title thereto.

This conclusion makes it unnecessary for us to discuss the other questions involved.

The writ of mandamus prayed for will be refused.