### ROSS et al. v. GREEN et al.

### No. 3383.

Court of Civil Appeals of Texas. Beaumont.

May 12, 1939.

Rehearing Denied May 24, 1939.

Lawler, Wood & Childress and Baker, Botts, Andrews & Wharton, all of Houston, for plaintiffs in error.

Hightower & Daniel, of Liberty, for defendants in error.

WALKER, Chief Justice.

This was an action in trespass to try title by defendants in error, W. J. Green et al., against plaintiffs in error, W. W. Ross et al., for the title and possession of a tract of 83.9 acres of land in Liberty County, on allegations that the land in controversy was part of the A. B. Hardin one-half league, granted to Augustin B. Hardin in 1831. Plaintiffs in error answered by pleas of not guilty and limitation; their theory was that the land in controversy was part of the Swail survey granted to William Swail in 1831. These two surveys are rec-

tangular in shape, with the Trinity River the common boundary line between them; the Hardin survey on the east side of the river, and the Swail survey on the west side. On trial to the court without a jury, judgment was in favor of defendants in error for the land in controversy. Plaintiffs in error have duly prosecuted their appeal to this court.

In support of the judgment, the trial court made and filed the following fact conclusions:

"1. This is a suit in trespass to try title by the plaintiffs, W. J. Green and Mrs. Adelia Cessna, against the defendants, for the title and possession of a part of the A. B. Hardin one-half league of Liberty County, Texas, and being that portion of said league known as the Mary Conley Bend, which lies west of the present course of the Trinity River, but prior to the sinking of the Mary Conley (a steamboat which formerly plyed the Trinity River,) said land was on the East side of the course of said Trinity River, and being all of said property in said league bounded on the north by the present course of the Trinity River and on all other sides by the old course of the Trinity River, together with that certain one-half of the old river bed adjacent and riparian to the land above described; and all of said property is particularly described in plaintiffs' petition.

"2. I find that the A. B. Hardin ½ league was patented by the State of Coahuilla and Texas to A. B. Hardin on May 3, 1931, by field notes, which call for the west line of said one half league to the Trinity River.

"3. When patented on May 3, 1831, I find that the Trinity River which formed the west boundary of the A. B. Hardin ½ League, was located as contended for by the plaintiffs in this trespass to try title suit, and that the river made a complete horseshoe bend around the land now in controversy, and followed the old river bend, which is now visible upon the ground. The center line of said Trinity River as it existed then and as now found upon the ground, is described as follows, to-wit: * * *

"5. The location of said Trinity River in 1831, was in the old channel particularly described above, and was such that the land in controversy in this suit was and still is a part of the A. B. Hardin ½ league, and was originally located on the East side of the Trinity River; but after the Mary Conley steamboat sank in the neck of the river bend now known as Mary Conley Bend, and as a result of the overflow and current of the river, the Trinity River cut a new channel through the neck of said bend as shown by the attached plat, leaving the land in controversy as well as the original channel on the West side of the present Trinity River Channel. After such cut, which was visible, the stream suddenly left its old bed and formed a new one, and the cut formed a new channel through which the main flow of the river has continued until the present time. The river deserted its original bed and forced for itself a new channel across the head of the Mary Conley bend, separating the land in controversy from the other portion of said tract in such a manner that the land in controversy can still be identified and was identified as having been separated from the rest of the A. B. Hardin ½ league and left on the west side of the present new channel. The change in channels was perceptible, and the land now left on the west side of the new channel still can be identified as the same land that was originally on the east side of the old river channel. The old abandoned river bed and all of the land in controversy lies above tidewater."

Plaintiffs in error attack, as without support in the evidence, the fact conclusion that the land in controversy was part of the Hardin survey in 1831, when it was granted to Augustin B. Hardin. We give the following brief summary of the facts, which support the findings of the court:

In the first part of 1872, the course of the Trinity River put the land in controversy on the east bank of the river as contended for by defendants in error, making the horseshoe bend described by the court in his fact conclusions; later in that year the river changed its course, putting the land in controversy on the west bank. In 1872, prior to the time the river changed its course, the channel of the river around the horseshoe bend was navigable by steamboats, and had been at all times within the memory of living witnesses. Nev Green, seventy-one years old, so testified; Henderson Day, eighty-one years old, so testified; Jim Jackson, seventy-two years old, so testified—these three witnesses had known the land in controversy all their lives and testified to the facts as they remembered them from their earliest boyhood. When he was a boy in 1904, Roscoe Davis, forty-one years old, lived on the Hardin survey

on the banks of the Trinity River, just across from the land in controversy. At that time this land was claimed by W. B. Green, the ancestor of defendants in error, as part of the A. B. Hardin survey; Green exercised general dominion over it and appropriated the timber on it. The owners of the Hardin survey claimed the land in controversy as part of the Hardin survey, and this claim was continuous within the memory of the living witnesses. This claim was based on the theory that the horseshoe bend existed from 1872 back to 1831. In 1932, Hugh Grimes made the following contract with Champ Ross, through whom plaintiffs in error claim, to occupy and use part of the Swail survey:

"Dear Sir: I hereby give you permission to use the portion of the south one-third of the Swail Survey in Liberty County, Texas, belonging to me which fronts on Old River for the purpose of renting boats for fishing purposes and also for placing such beehives thereon as you desire, this license being terminable at any time that I may elect to terminate the same. In consideration of giving you this license you have agreed and by accepting hereunder do agree to prevent any trespassing on the property or cutting timber therefrom unless I give my consent first to the cutting of the timber. It is expressly understood that I reserve the right to terminate this license at any time at my pleasure.

"Yours truly, Champ Ross."

Hugh Grimes was acquainted with the land in controversy, the "Mary Conley Bend"; he was living on the west side of the river; holding under Champ Ross he made no effort to take possession of the "Mary Conley Bend," the land in controversy; while he was living on the Swail, under his contract with Ross, he heard of threats to cut the timber on the "Mary Conley Bend"; he notified Champ Ross of these threats and received from him the following reply, read into the record by counsel for plaintiffs in error:

"Mr. H. E. Grimes, Route 1, Dayton, Texas.

"Dear Sir: I am in receipt of your letter of the 14th instant in reference to timber between the old river and the present channel. My information is that about 1876 the channel of the river was in the place now called the old river and the channel was changed by cutting across the bend and that the land between the old river and the new channel was formerly on the east side of the river. I have supposed that such a change in the river involving a piece of land of that size would not operate to change the title and that the title to the land really belongs to whoever owned it before the change in the channel or as acquired by deed under him or inherited from him. I would not at the present time care to enter into any controversy as to the timber.

"Thanking you for advising me of the matter, I am, yours truly, Champ Ross."

We do not agree with the construction given by plaintiffs in error to the decisions by the courts of this state that, as an absolute proposition of law, under all conditions, "the presumption of continuance of a proven condition operates prospectively, not retrospectively." See Ralls v. Parish, Tex.Civ.App., 151 S.W. 1089; Western Union Tel. Co. v. Hughey, 55 Tex.Civ.App. 403, 118 S.W. 1130; Brenan v. Eubank, Tex.Civ.App., 56 S.W.2d 513; Milmo Nat. Bank v. Cobbs, Tex.Civ. App., 128 S.W. 151; 17 Tex.Jur., page 258. Decisions of the Texas Courts fall well within the following general principles announced in 1 Wigmore, Evidence (2d Ed.), 436, 437, Sec. 437:

"The possibility of such circumstances will depend almost entirely on the nature of the specific thing whose existence is in issue and the particular circumstances affecting it in the case in hand. * * *

"Similar considerations affect the use of subsequent existence as evidence of existence at the time in issue. Here the disturbing contingency is that some circumstances operating in the interval may have been the source of the subsequent existence, and the propriety of the inference will depend on the likelihood of such intervening circumstances having occurred and been the true origin. On landing at New York it can hardly be inferred that the steamer at the next dock has been there for a week; but it may usually be inferred that the dock has been there for some years; while the particular circumstances of appearances and the like will in the last instance affect the length of time to which the inference could be carried back. Here, as with prior indications, the interval of time to which any inference will be allowable must depend upon the nature of the thing and the circumstances of the particular case."

Defendants in error did not rest their case on the mere existence of a fact in 1872, and the presumption of existence of a similar fact as of 1831. The testimony of Henderson Day, eighty-one years old, in 1937, reasonably carried the existence of the fact—the course of the river around the horseshoe bend back from 1872 to 1860; he testified that, at all times from his boyhood to 1872, steamboats navigated the Trinity River around this bend. It is our conclusion, on the facts and law, that the finding of the court that the land in controversy was included within the grant of the A. B. Hardin survey in 1831 must be affirmed.

Plaintiffs in error contend that defendants in error did not establish a right to prosecute this suit. Their point is that, though they showed that their ancestor through whom they claimed was dead and that he died intestate, they did not establish when he died, nor did they establish that no administration was pending on his estate and that none was necessary. The petition of defendants in error was in the statutory form of trespass to try title. It was held by our Supreme Court in Pure Oil Co. v. Tunnell, 126 Tex. 57, 86 S.W.2d 207, 209, that the simple allegation of these facts constituted a cause of action, and that it was not necessary for the plaintiff to allege that the deceased died intestate and that no administration was pending on his estate and that none was necessary. But it was said in that case, "It was incumbent on them, however, to show by testimony that no administration of the estate of Mrs. Tunnell is pending and none is necessary. They failed to make this proof. This furnished legally sufficient ground for dismissal of their suit, but not for the judgment which the trial court rendered concluding the merits of their claim. In a case of this sort, proof of no administration and no necessity respects the right of the claimants to sue rather than the merits of their claim." See, also, Olsan Bro. v. Miller, Tex.Civ.App., 108 S.W.2d 856. We believe that the evidence satisfies the legal proposition announced in the Tunnell case.

On the issue of the date of the death of W. B. Green, the ancestor of defendants in error through whom they claimed; W. B. Green paid the taxes on the land up to 1918—after that date the taxes were paid by his estate. The evidence showing the death of W. B. Green, the court was authorized to find on the tax statement, which was not controverted nor explained, that Green died in 1918.

On the pendency of administration on the estate of W. B. Green and the necessity for an administration: The evidence showed affirmatively that Green died intestate. After his death, his heirs took charge of the estate, and divided it, each claiming to own his moiety. The fact that the heirs took possession of the property in 1918 and exercised exclusive dominion over it authorized the court to find that the estate was not in administration. Green died in 1918; this case was tried in 1937—a period of nineteen years. On this fact the court was authorized to find that no debts existed against the estate on the date this case was tried and, therefore, that no necessity existed for an administration.

It follows that the judgment of the lower court should be affirmed, and it is accordingly so ordered.

Affirmed.